UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF DONALD MALIK LEVINGSTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF KERN, et al., <br><br> Defendants. | Case No.: 1:16-cv-0188 - DAD - JLT <br><br> ORDER GRANTING DEFENDANTS' MOTION FOR A PROTECTIVE ORDER <br><br> (Doc. 36) |

Plaintiffs contend the defendants are liable for the wrongful death of Donald Levingston, who while in the custody of the Kern County Sheriff's Department. Plaintiffs contend the County has long been on notice that deputies "repeatedly violate[] the Constitutional rights of citizens by subjecting them to searches and arrests without probable cause, causing citizens to be subjected to excessive force, fabricating information in reports," and more. (Doc. 31 at 7, ¶ 7) Plaintiffs assert Sheriff Donny Youngblood is liable for the wrongful death of Mr. Levingston, and seek to impose "supervisory liability" under 42 U.S.C. § 1983. (*See id.* at 8, 15, 20)

Defendants seek a protective order to prevent the deposition of Sheriff Youngblood. (Doc. 36) Plaintiffs oppose the entry of a protective order, arguing Defendants fail to carry the burden to demonstrate a protective order is proper. (Doc. 37) For the reasons set forth below, Defendants motion for a protective order is **GRANTED**.

1

**I.  Background**

Plaintiffs are the surviving wife of Decedent Donald Levingston, his minor children and the estate of Mr. Levingston. (*See* Doc. 31 at 2)  Plaintiffs assert that on February 26, 2015, deputy David Manriquez with the Kern County Sheriff's Department "initiated a traffic stop of the decedent… for allegedly failing to stop at a posted stop sign at about 6:14 p.m." (*Id.* at 5, ¶ 18)  Plaintiffs assert that Levingston, an African-American male, "had numerous prior contacts" with Manriquez prior to the traffic stop, and "had been harassed… on an on-going basis based upon his race" by sheriff's deputies. (*Id.*)  According to Plaintiffs, during the stop, Manriquez "opined that [Levingston] was under the influence of a central nervous system stimulant and advised him that he was under arrest." (*Id.* at 6, ¶ 20)  Plaintiffs assert that Manriquez "believed ….[he] had swallowed a lethal dose of narcotics." (*Id.*)  Manriquez handcuffed and searched Levingston, and no substances were found.

Plaintiffs allege that while Manriquez was "transporting Levingston to the Central Receiving Facility, became apparent to Manriquez that Levingston was experiencing a severe medical emergency.' (Doc. 31 at 6, ¶ 21, emphasis omitted)  However, Plaintiffs contend that "[i]n lieu of obtaining immediate emergency medical care," the deputy "stopped first at a Walgreen's parking lot," where he notified dispatch that Levingston "was being uncooperative." (*Id.*, ¶ 22)  Plaintiffs allege Manriquez then drove a fire station "to wait for assistance from additional officers to assist" in the arrest. (*Id.*)  In addition, Hall Ambulance was called to perform an evaluation of Levingston, and paramedic Brenda Robinson went to the fire station. (*Id.*, ¶ 23)

According to Plaintiffs, Levingston was not given "thorough and complete medical evaluation." (Doc. 31 at 6, ¶ 24)  In addition, Plaintiffs allege that "[d]espite clear indications that [Levingston] was in need of immediate medical care," he was transported to the Kern County Central Receiving facility in Downtown Bakersfield. (*Id.*)  Plaintiffs assert Levingston exhibited "symptoms of an extreme and serious medical emergency" while being booked. (*Id.* at ¶ 25)

Plaintiffs assert that "almost four hours after the initial stop," Manriquez transported Levingston to Kern Medical Center. (Doc. 31 at 7, ¶ 26)  They contend that Levingston "was foaming at the mouth and incoherent" by the time he arrived at Kern Medical Center. (*Id.*)  He was pronounced dead at 12:13 a.m. on February 27, 2016. (*Id.*, ¶ 27)

According to Plaintiffs, the County has "long been on actual notice that… Deputies have repeatedly violated the Constitutional rights of citizens by subjecting them to searches and arrests without probable cause, causing citizens to be subjected to excessive force, fabricating information in reports, providing false and/or intentionally misleading information in Internal Affairs investigations and have otherwise caused citizens to be subjected to the violation of their Constitutional rights." (Doc. 31 at 7, ¶ 28) Plaintiffs contend these "customs, policies, patterns and/or practices are the product of a culture of tolerance… in which the end result, i.e., arrest and/or prosecution, takes precedent over following the rules and policies dictated by the Constitutions of the United States of America and the State of California." (*Id.*, ¶ 29) Further, Plaintiffs assert that there is "policy rooted in deliberate indifference to the constitutional rights of African Americans," such as Levingston, demonstrated by "the hiring, retention, and promotion of … deputies who routinely engage in civil rights violations and/or who have encouraged, authorized and/or condoned said practices." (*Id.* at 7-8, ¶ 30)

Plaintiffs allege Sheriff Youngblood "is responsible for the supervising [of] all… deputies d/or agents responsible for providing care to persons in the custody" of the sheriff. (Doc. 31 at 20-21, ¶ 87) They contend the acts of Manriquez—including being deliberately indifferent to the serious medical need of Levingston and discriminating against Levingston on the basis of race— "were the direct and proximate result of customs, practices, and policies of Defendant Donny Youngblood." (*Id.* at 15, 21, ¶¶ 64, 88) Plaintiffs assert:

> Such policies, customs and/or practices include but are not limited to an ongoing pattern of deliberate indifference, including the following: the failure to establish a protocol for deputies to recognize and identify the general indicators of mental illness and or severe narcotics intoxication so that appropriate actions can be taken; the failure to establish a protocol for taking into custody civilians suspected of being under the influence of a central nervous system stimulant, including but not limited to methamphetamine; the failure to implement a protocol or procedure to take persons who are experiencing a serious medical emergency, including but not limited to persons exhibiting severe signs of narcotics intoxication and/or mental health disorders be transported to a local emergency room or a mental health facility for evaluation rather than arrest said persons for purposes of incarceration; the failure to establish protocols or policies to safely take into custody, those persons showing signs of severe narcotics intoxication and/or mental health disorders; the failure to act upon clearly life-threatening symptoms and reports; the failure to provide appropriate training to deputies to ensure adequate evaluation and treatment for seriously ill persons taken into custody; and the failure to implement a policy to ensure that deputies would contact and summon appropriate medical treatment in a timely manner.

(*Id.* at 15-16, ¶ 65) Plaintiffs also contend there was an ongoing pattern and policy of Youngblood to

3

engage in "racial profiling whereby probable cause is fabricated to effectuate the arrests of African-American civilians." (*Id.* at 21, ¶88-89). Plaintiffs allege that County policy-makers, such as Sheriff Youngblood, "tacitly encouraged, ratified and/or approved of the acts and/or omissions alleged herein, and knew that such conduct was unjustified and would result in violations of constitutional rights." (*Id.* at 16-17, 21, ¶¶ 68 and 92)

Based upon the foregoing facts, Plaintiffs identify the following causes of action in their First Amended Complaint: (1) wrongful death; (2) deliberate indifference to serious medical needs, health, and safety in violation of the Fourteenth Amendment; (3) municipal liability for violations of Plaintiffs' rights of health and safety; (4) supervisory liability for violations of Plaintiffs' rights of health and safety; (5) discrimination on the basis of race in violation in the Fourteenth Amendment; (6) municipal liability for violations of the right to be free from discrimination; (7) supervisory liability for the violations of the right to be free from discrimination; and (8) intentional infliction of emotional distress. (*See generally* Doc. 31 at 8-24) Sheriff Youngblood is identified as a defendant to the first, fourth, and seventh causes of action.

Defendants now seek a protective order to preclude the taking of Sheriff Youngblood's deposition. (Doc. 36) According to Defendants, the deposition would qualify as an "apex" deposition given the sheriff's status as "a high ranking elected government official." (*Id.* at 5) Plaintiffs filed their opposition to the motion on June 7, 2017 (Doc. 37), to which Defendants filed a reply on June 14, 2017. (Doc. 38)

## II.     Scope of Discovery and Depositions

The scope and limitations of discovery are set forth by the Federal Rules of Civil Procedure. In relevant part, Rule 26(b) states:

> Unless otherwise limited by court order, parties may obtain discovery regarding any nonprivileged manner that is relevant to any party's claim or defense — including the existence, description, nature, custody, condition, and location of any documents or other tangible things . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the accident. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b). Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

4

probable than it would be without the evidence." Fed. R. Evid. 401. Relevancy is interpreted "broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

A party may take the deposition of "any person, including a party" pursuant to the procedures outlined in the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 30(a)(1)-(2). "Only a party to litigation may be compelled to give testimony pursuant to a notice of deposition." *U.S. v. Afram Lines (USA), Ltd.*, 159 F.R.D. 408, 413 (S.D.N.Y. 1994).

### III. Entry of Protective Orders

The Court may issue a protective order to shield any party from undue burdens arising from discovery. Fed. R. Civ. P. 26(c). Specifically, Rule 26 provides:

> The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
> (A) forbidding the disclosure or discovery;
> (B) specifying terms, including time and place, for the disclosure or discovery;
> (C) prescribing a discovery method other than the one selected by the party seeking discovery;
> (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;
> (E) designating the persons who may be present while the discovery is conducted;
> (F) requiring that a deposition be sealed and opened only on court order;
> (G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way; and
> (H) requiring that the parties simultaneously file specified documents or information in sealed envelopes, to be opened as the court directs.

Fed. R. Civ. P. 26(c). The Ninth Circuit determined this Rule provides the Court with "extensive control" over the discovery process, and "authoriz[es] courts to make any order which justice requires" to protect the parties. *United States v. CBS, Inc.*, 666 F.2d 364, 369 (9th Cir. 1982) (internal quotation marks omitted).

In general, it is rare for a court to disallow the taking of a deposition. *See Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) ("strong showing is required before a party will be denied entirely the right to take a deposition"); *see also Apple Inc. v. Samsung Electronics Co.,* 282 F.R.D. 259, 263 (N.D. Cal. 2012) ("it is very unusual for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances"). In general, under Rule 26 "the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is

granted." *Phillips v. GMC*, 307 F.3d 1206, 1210-1211 (9th Cir. 2002). However, when an apex deposition is at issue, courts are inconsistent as to whether the party resisting the discovery or the party seeking to depose the high-ranking official bears the burden related to whether the deposition should go forward. *See In re Transpacific Passenger Air Transportation Antitrust Litig.,* 2014 WL 939287, at *2 (N.D. Cal. Mar. 6, 2014).

### IV. "Apex" Depositions

The deposition of a high-level official or executive, often referred to as an "apex" deposition, may be precluded by the Court under Rule 26(c) where the discovery sought "can be obtained from some other source that is more convenient, less burdensome, or less expensive." *Apple Inc. v. Samsung Electronics Co., Ltd*, 282 F.R.D. 259, 263 (N.D.Cal. 2012). Heads of government agencies, in particular, "are not normally subject to deposition," "absent extraordinary circumstances." *Green v. Baca*, 226 F.R.D. 624, 648 (C.D. Cal. 2005) (quoting *Kyle Eng. Co. v. Kleppe*, 600 F.2d 226, 231-32 (9th Cir. 1979)).

As an initial matter, an individual objecting to a deposition must first demonstrate he "is sufficiently 'high-ranking' to invoke the deposition privilege." *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1049 (E.D. Cal. 2010) (citing *United States v. Sensient Colors, Inc.*, 649 F.Supp.2d 309, 320 (D. N.J. 2009). Upon this showing, the Court then should consider: "(1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods." *Apple, Inc.*, 282 F.R.D. at 263*; see also Coleman v. Schwarzenegger*, 2008 WL 4300437 at *2 (E.D. Cal. Sept. 15, 2008) ("The extraordinary circumstances test may be met where high-ranking officials 'have direct personal factual information pertaining to material issues in an action,' and 'the information to be gained is not available through any other sources.'" [citations omitted]).

The Plaintiffs dispute that they are obligated to show that there are other, lesser intrusive means to discover the information and cite to several cases. For example, they cite *Hunt v. Cont'l Cas. Co.*, 2015 WL 1518067, at *2 (N.D. Cal. Apr. 3, 2015). However, *Hunt* quoted *Apple Inc. v. Samsung Elecs. Co., Ltd,* 282 F.R.D. 259, 263 (N.D. Cal. 2012) which held, "When a party seeks the deposition of a high-level executive (a so-called "apex" deposition), courts have "observed that such discovery

creates a tremendous potential for abuse or harassment." [Footnote] The court therefore has discretion to limit discovery where the discovery sought "can be obtained from some other source that is more convenient, less burdensome, or less expensive."[Footnote]." *Hunt* further quoted *Apple* when it stated, "In determining whether to allow an apex deposition, courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods." *Apple*, 282 F.R.D. at 263 quoting *In re Google Litig.*, 2011 WL 4985279, at *2 (N.D.Cal. Oct. 19, 2011). Though *Hunt* at 13 observes, "Nor has formal "exhaustion" been viewed as an absolute requirement; instead, exhaustion of other discovery methods is an important, but not dispositive, consideration for a court to take into account in deciding how to exercise its discretion," this is far from a determination that a party is not obligated to pursue lesser burdensome means.

Plaintiffs also cite *In re Transpacific Passenger Air Transportation Antitrust Litig.*, 2014 WL 939287, at *5 (N.D. Cal. Mar. 6, 2014), which holds similarly. Indeed, *Transpacific* observes," The history of the propounding party's efforts to obtain the information through other discovery, or lack of such efforts, can shed considerable light on whether the party is seeking the apex deposition for appropriate purposes. Therefore, to safeguard against abuse, harassment, and undue burden, the court should consider whether and how the party seeking the deposition has attempted to use other less intrusive discovery methods, in addition to whether the deponent possesses unique, firsthand knowledge." *Id.* On the other hand, both *Hunt* and *Transpacific* hold that the plaintiff must show that the apex official "may have unique first-hand knowledge regarding the facts at issue in this case" (*Hunt* at 2).

At the hearing, Plaintiffs cited *Smith v. City of Stockton*, Case No.: 2:15-cv-00363 KJM AC. In *Smith*, the police chief resisted the deposition while relying upon the apex doctrine. However, in doing so, the chief failed to present any evidence that he did not have firsthand knowledge of the facts that were pertinent to the case. *Id*. at 4. Rather, the plaintiff demonstrated that despite knowledge of unconstitutional prior conduct by the department, the chief was the "author" of the "officer-involved shooting policy" and implemented it just after the incident involving the plaintiff. *Smith v. City of Stockton*, Case No.: 2:15-cv-00363 KJM AC, Doc. 62 at 4 ["A protective order might therefore be

7

warranted if plaintiff wanted the deposition solely to obtain evidence that Jones does not have, or that is easily obtainable from others."])

**V.     Discussion and Analysis**

Defendants contend that Sheriff Youngblood "is a high-ranking government official subject to the 'apex' deposition privilege." (Doc. 36 at 5)  In addition, Defendants contend that no "extraordinary circumstances" exist to justify the deposition because Sheriff Youngblood does not have personal knowledge of the events giving rise to the complaint. (*Id.*)  Further, Defendants assert the information sought could be obtained through less intrusive means, "including through written discovery or the depositions of the KCSO's Persons Most Qualified." (*Id.*)  On the other hand, Plaintiffs contend Defendants fail to meet the burden to demonstrate good cause for preventing the deposition, and that Sheriff Youngblood "has personal knowledge of matters relevant to this case." (Doc. 37 at 6-7)

**A.     Status as a High-Ranking Official**

As a threshold matter, Youngblood must establish that he is a high-ranking official to invoke the apex deposition privilege. *See Thomas*, 715 F. Supp. 2d at 1049.  As Defendants observe, Youngblood is "the highest ranking peace officer agency government official in Kern County." (Doc. 36 at 5)  Plaintiffs do not dispute this status. (*See generally* Doc. 37)

Notably, courts throughout the Ninth Circuit have determined that the position of sheriff is a high-ranking official to whom the apex doctrine may apply. *See Anderson v. County of Contra Costa*, 2017 WL 930315 (N.D. Cal. Mar. 9, 2017) (finding the sheriff was "an apex employee or high-ranking official, to whom the apex doctrine applies"); *Myles v. County of San Diego*, 2016 WL 4366543, at *4 (finding the sheriff subject to the apex doctrine where plaintiff acknowledged he was the department's "chief policy maker and highest ranking government officer)"; *K.C.R. v. Cty. of L.A.*, 2014 WL 3434257, at *6 (C.D. Cal. July 11, 2014) (collecting cases and concluding that "ample authority … supports the proposition that a sheriff is a high-ranking government official entitled to protection"). Given the lack of dispute regarding Youngblood's status as the highest-ranking peace officer, the Court finds he is an apex official to whom the doctrine may apply.

**B.     Good Cause**

Youngblood takes the position that because he lacks firsthand knowledge of relevant facts, his

position as the Sheriff of the County of Kern should preclude his deposition. He does not claim prejudice or harm would result from having to submit to a deposition. However, a purpose to harass or annoy may be inferred where there is no showing the high-ranking official has relevant and personal knowledge about the facts at issue. *Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*, 2006 WL 2578277, at *3 n.3 (N.D.Cal. Sept. 6, 2006); *Smith v. City of Stockton*, Case No.: 2:15-cv-00363 KJM AC, Doc. 62 at 4.

### C. Youngblood's Knowledge

In general, "when a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." *See e.g. WebSideStory, Inc. v. NetRatings*, 2007 WK 1129567 at *2 (S.D. Cal. Apr. 6, 2007). Conversely, "when a high-ranking official is removed from the daily subjects of the litigation, [and] has no unique personal knowledge of the facts at issue, a deposition of the official is improper." *K.C.R*, 2014 WL 3434257, at *4.

Defendants contend that Youngblood possesses "no first hand or direct knowledge of the incident, investigation, autopsy, training issues, policy issues and/or on mental health/disabled persons." (Doc. 36 at 5) Rather, Defendants assert that all of the sheriff's "information on the Levingston incident is second hand, primarily from legal counsel, command staff and department supervisors." (*Id.*; *see also* Doc. 36-1 at 2, Youngblood Decl. ¶ 4) Youngblood reports he "did not become aware of the Levingston incident until after the California Tort Claims Act was filed with the Kern County Clerk of the Board." (*Id.*, *see also* Youngblood Decl. ¶ 5)

Further, Defendants contend that while the sheriff "approved the overall training regime for KCSO, he is not the person most knowledgeable regarding individual deputies' training or the training practices in effect in February 2015." (Doc. 36 at 4) Likewise, Defendants assert he is not the person most knowledgeable regarding the research, preparation and/or implementation of the policies and procedures, the training practices which implement the policies and procedures and/or the version of the various policies and procedures which were in effect in February 2015." (*Id.*) Finally, Youngblood did not "personally provide any training to any deputy, command staff member, Coroner's staff member or contract pathologist involved in the incident, investigation, or autopsy." (*Id.* at 4; *see also* Doc. 36-1, Youngblood Decl. ¶ 16)

9

Despite this, Plaintiffs assert Youngblood has "first-hand, non-repetitive information relating to his own liability in this case," as he "is sued in both his official and individual capacities." (Doc. 37 at 5) Plaintiffs contend that not only does Youngblood approve the overall training regime, but he also "issued a statement for the record regarding "Law Enforcement Responses to Disabled Americans: Promising Approaches for Protecting Public Safety."[1] (*Id.*) According to Plaintiffs, Youngblood's "personal knowledge of these approaches and whether or not they have in fact been implemented are directly relevant to the constitutional violations sustained by the Decedent in this case." (*Id.*) Further, Plaintiffs argue Youngblood has "unique personal knowledge regarding his actions or inactions in response to prior constitutional violations committed at the hands of Kern County Sheriff Deputies under his watch, such as acting or failing to act to impose discipline or adopt new policies for preventing future uses of excessive force, and his supporting reasons." (*Id.* at 6)

Toward this end, Plaintiffs cite to several cases which they claim demonstrate that the Youngblood knows that the policies and/or actions of his deputies have given rise to unconstitutional conduct. (Doc. 37-1 at 2-3) They claim these cases demonstrate that Youngblood has failed to take action to correct the policies and has affirmatively ratified the unlawful actions of his deputies. *Id*. However, Plaintiffs fail to show that any demonstrate unconstitutional conduct.

For example, contrary to the sworn statement of Plaintiff's counsel (Doc. 37-1 at 2 ¶ 5), the *Lucero* case determined that the officers acted negligently but the jury was not asked to make a finding related to any unconstitutional conduct and did not do so. (Doc. 38-2) Despite Plaintiff's characterization of the *Garlick* (Silva*)* matter, this case resolved without any determination of liability and, prior to that, the Court granted judgment in favor of the County of Kern on the *Monell* claims. (Doc. 38-1 at 3) In granting summary judgment to the County, the Court found there was no evidence the County of Kern ratified the deputies' conduct related to the death of Mr. Silva. (*Garlick v. County of Kern*, Case No.: 1:13-cv-01051 LJO JLT, Doc. 157 at 76) Similarly, neither the *McDaniel* nor the

---

[1] The Court has found no allegation in the complaint that the Plaintiffs assert that the decedent was under the influence of any substances or that he suffered from a mental illness at the time of the events giving rise to the complaint. (Doc. 1-2) At the hearing, Plaintiffs' counsel asserted that the toxicology report associated with his autopsy indicated that he was under the influence of methamphetamine and that their expert would opine that this caused the decedent's conduct related to his arrest. Exactly how this equates to a mental illness is not clear to the Court and it remains unclear how policies related to mental illness are at issue in light of the fact that discovery is confined to the issues raised in the pleadings.

*Mahood* case[2] has been tried and the Court has not been asked to determine any constitutional questions. (*Id.* at 3-4.) Moreover, counsel for the defendants attests that at least as long as he has been employed with the County of Kern—2005—neither the County of Kern nor any employee of the County has been found by any court to have violated the constitutional rights of another.[3] (Doc. 38-1 at 2)

Notably, though Deputy Manriquez was asked at his deposition whether he suffered discipline as a result of the incident with the decedent and he denied that he did, Youngblood's declaration makes clear that he was not aware of the incident until Plaintiffs' submitted a tort claim. In addition, defense counsel reported that there was not a personnel action so Youngblood was never confronted with the issue of whether Deputy Manriquez's conduct was within or without department policy and Plaintiffs' counsel agreed there was no evidence of ratification. Likewise, it was apparent to the Court that Plaintiff had no evidence of ratification of the conduct of the officers involved in the other cases cited in counsel's declaration.

When asked exactly what information Plaintiffs seek from Youngblood, counsel reported that she wanted testimony about the relevant policies but admitted she had not yet made any effort to gain this evidence from other sources. Nevertheless, Youngblood has attested that, though he approves the ultimate policies, he asserts that he is not the person most knowledgeable about the "research, preparation and/or implementation of the policies and procedures, the training practices which implement the policies and procedures and/or the versions of various policies and procedures which were in effect in February 2015." (Doc. 36-5 at 4 ¶ 18) When asked why she believed Youngblood to be a better source for this information than those who develop and implement these policies, she

---

[2] The Court takes judicial notice of the dockets in the cases of *Garlick v. County of Kern*, Case No.: 1:13-cv-01051 LJO JLT, *The Estate of Christopher McDaniel v. County of Kern*, Case No.: 1:15-cv-01320 JAM JLT and *M.M. v. County of Kern*, Case No.: 1:16-cv-00376 DAD JLT. The court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); United States v. Bernal-Obeso, 989 F.2d 331, 333 (9th Cir. 1993). The record of this Court's docket is a source whose accuracy cannot reasonably be questioned, and judicial notice may be taken of court records. Mullis v. United States Bank. Ct., 828 F.2d 1385, 1388 n.9 (9th Cir. 1987); Valerio v. Boise Cascade Corp., 80 F.R.D. 626, 635 n. 1 (N.D.Cal.1978), *aff'd*, 645 F.2d 699 (9th Cir.); see also Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989); Rodic v. Thistledown Racing Club, Inc., 615 F.2d 736, 738 (6th. Cir. 1980).

[3] The Court recognizes, as do the Plaintiffs, that this does not mean that no such unconstitutional conduct has occurred within this time period. However, it directly contradicts the statements of Plaintiff's counsel that such court determinations have been made (Doc. 37-1 at 2).

reported only that she did not believe that Youngblood didn't have more knowledge than the employees who develop, administer and train on these policies.

The Court may refuse to allow the deposition of the apex employee before the party makes effort to take the deposition of lower level employees who are more closely tied to the issues to be addressed. *See Salter v. Upjohn*, 593 F.2d 649, 651 (5th Cir.1979). Thus, the Court will **GRANT** the protective order. In the event that plaintiffs take the depositions of, or propound other discovery to, those actually involved in the development and implementation of the relevant policies *and* plaintiffs make a showing that they made reasonable efforts to obtain the needed evidence but cannot do so except via a deposition of Youngblood, the Court will consider lifting the protective order at that time.

**VI. Conclusion and Order**

Based upon the foregoing, the Court **ORDERS**: Defendants' motion for a protective order is **GRANTED**.

IT IS SO ORDERED.

Dated: **June 22, 2017**          /s/ Jennifer L. Thurston
                                  UNITED STATES MAGISTRATE JUDGE