1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ESTATE OF DONALD MALIIK                    No.  1:16-cv-00188-DAD-JLT
     LEVINGSTON, TRACI MORALES,
12   individually and as successor in interest to
     the Estate of Donald Maliik Levingston,
13   ELIJAH LEVINGSTON, ELIZABETH             ORDER GRANTING MOTION FOR
     LEVINGSTON, ELISHA LEVINGSTON,           SUMMARY JUDGMENT
14   and D'ANDRE GONZALEZ
     LEVINGSTON,                               (Doc. No. 58)
15
                       Plaintiffs,
16
             v.
17
     COUNTY OF KERN and DAVID
18   MANRIQUEZ,

19                     Defendants.

20

21           This case concerns the death of Donald Maliik Levingston (hereafter, "the decedent")

22   following his arrest by Deputy David Manriquez of the Kern County Sheriff's Department in

23   early 2015.  Defendants filed a motion for summary judgment on November 16, 2017.  (Doc. No.

24   58.)  Plaintiffs opposed the motion on December 4, 2017, and defendants filed a reply on

25   December 11, 2017.  (Doc. Nos. 62, 64.)  A hearing was held on December 19, 2017, with

26   attorney Nichelle Jones appearing on behalf of plaintiffs and Chief Deputy County Counsel

27   Andrew Thomson appearing on behalf of defendants Kern County and Deputy Manriquez.

28   /////

Following the hearing, the matter was taken under submission.  For the reasons set forth below,
defendants' motion for summary judgment will be granted in part and this action will be
remanded to the Kern County Superior Court as to plaintiffs' remaining state law claims.

## BACKGROUND

The parties dispute only a few facts on summary judgment.  These factual disputes and the
evidentiary support for them are addressed more specifically below to the extent necessary in
resolving the pending motion.  The facts summarized below are undisputed.  (*See* Doc. No. 62-1
at 2–19; Doc. No. 65 at 18–34.)

At approximately 6:15 p.m. on February 26, 2015, defendant Deputy Manriquez, who is a
deputy with the Kern County Sheriff's Department, observed a vehicle fail to stop at a stop sign
at the intersection of Bear Valley Road and Cummings Valley Road in Tehachapi, California.
The vehicle was driven by the decedent.  Deputy Manriquez pulled the vehicle over to issue its
driver a citation, and then recognized decedent as someone he had previously cited and released
for being under the influence of methamphetamines.  Manriquez noticed decedent was exhibiting
behaviors suggesting he was again under the influence of methamphetamines, including
accelerated speech, eye tremors, and nervousness.  Manriquez had been with the Kern County
Sheriff's Department for three years and eight months, and had been trained to identify the signs
and symptoms of individuals under the influence of methamphetamines.  Decedent admitted,
when asked by Deputy Manriquez whether he had recently used any illegal drugs, that he had
snorted something within the last few days.  Following field tests to determine his level of
impairment, Deputy Manriquez arrested decedent for being under the influence of a stimulant.

Defendant Manriquez decided to take decedent to the Kern County Sheriff's Office's
Central Receiving Facility ("CRF"), located in Bakersfield, California, for booking.  During the
transport to the CRF, decedent began moving erratically in the rear seat of the police car, stating
he had to urinate.  Deputy Manriquez pulled off the highway into a Walgreen's parking lot, and
discovered decedent with his pants partially pulled down and his right hand reaching toward his
buttocks area.  Concerned that decedent had contraband he was attempting to hide, Deputy
Manriquez asked decedent if he had either a weapon or narcotics.  Decedent denied having either.

As Manriquez resumed the drive to the CRF, decedent again began moving frantically in the backseat trying to reposition his hands, which were handcuffed, to the front of his body. Manriquez could feel the vibrations throughout the car from decedent's movements. He therefore again pulled off the highway, this time into the parking lot of a café in Keene, California. Upon checking on decedent again, Manriquez found him lying face down in a prone position in the back seat of the police car. However, decedent continued to deny having or ingesting any contraband or drugs despite renewed questioning by Deputy Manriquez. Nevertheless, Manriquez took decedent to the nearby Kern County Fire Station 11 in Keene, California (hereafter, "Keene Fire Station"), where he was examined by firefighters who took his vitals. None of the firefighters, who were emergency medical technicians, advised Manriquez there was anything medically wrong with decedent. Manriquez ordered decedent to spit into a plastic glove, believing decedent might have something in his mouth. However, after decedent did so, Manriquez found no narcotics or unusual material.

Despite the findings of the firefighters, Brenda Robinson, a paramedic with Hall Ambulance Services, was called to the Keene Fire Station. To some extent the parties dispute what precisely Robinson was told,[1] what she determined as a result of her examination of decedent,[2] and what Manriquez's understanding was following Robinson's examination.[3]

---

[1] Defendant Manriquez testified at his deposition that when Robinson arrived, he "explained to her what was going on," that he had arrested decedent for being under the influence, that decedent was acting erratically and sweating, and that "it could be a possibility that he ingested . . . narcotics." (Doc. No. 63-1 at 22.) Robinson noted that upon arriving at the scene she was told that Manriquez was worried decedent had swallowed bags of meth. (Doc. No. 63-6 at 2–3.)

[2] According to defendant Manriquez's deposition testimony, he saw Robinson check decedent's "vitals," which at least included a blood pressure reading. (Doc. No. 58-4 at 44–46.) Robinson testified that she took decedent's blood pressure, which was relatively normal, but that decedent refused to allow her to use a glucometer on him to test his blood sugar. (Doc. No. 58-6 at 7–8.) Robinson testified that in addition to blood pressure, she checked decedent's oxygen saturation levels and pulse. (Doc. No. 63-6 at 8.)

[3] Deputy Manriquez also testified at deposition that Robinson told him decedent was okay, "[b]ased on his attitude and the tests that she had done." (Doc. No. 58-4 at 47–48.) A declaration from Manriquez states that Robinson told him all of decedent's "vital signs were normal." (Doc. No. 58-5 at ¶ 12.) Plaintiffs do not actually dispute that Robinson told Manriquez this, but maintain that Manriquez should have known decedent was not okay regardless of what Robinson

However, the evidence on summary judgment is clear that Robinson warned decedent at least three times that if he had ingested drugs, his life could be in danger. Each time, decedent either shook his head, denied having ingested drugs, or cursed at her. It is also undisputed that Robinson did not suggest to Deputy Manriquez, or to others present at the Fire Station, that decedent should be taken to a hospital, but rather advised Manriquez that the decedent was okay. Manriquez too questioned decedent at the fire station about whether he had or had ingested drugs, which decedent again denied.[4] Ultimately, Deputy Manriquez did not take decedent to a hospital at that time, and instead proceeded to the CRF.[5]

Upon arrival at the CRF, decedent was examined by the jail's nursing staff, who told Manriquez decedent would need to be cleared by the hospital prior to booking due to his sleep

---

told him. Particularly, plaintiffs point to Manriquez's testimony that he had previously interacted with decedent, and that in all his prior interactions, decedent had been "respectful." (Manriquez Depo. at 117; *see also* Doc. No. 65 at 20.) However, on this occasion, Manriquez testified decedent was using profanity, which he had never done before, sweating a lot, and appearing "overall upset." (Manriquez Depo. at 117.) Manriquez also testified that he had "never encountered someone acting the way [decedent] was, sweating the way he was, acting erratic the way he was." (*Id.* at 118.) By the time they reached the fire station, according to Manriquez, decedent "wasn't the same individual that I initially contacted during the traffic stop." (*Id.* at 197.) According to plaintiffs, this evidence shows Deputy Manriquez should have known decedent was likely overdosing. Testimony from other Kern County Sheriff's Deputies who were present at the fire station, including Deputies Ana Alvarez and David Rutter, suggest it was apparent that decedent was under the influence of methamphetamines. Both Deputies Alvarez and Rutter testified they believed decedent was under the influence of methamphetamines because he was sweating, had a white coating in his mouth, was paranoid, was unable to hold still, and was speaking rapidly. (Doc. No. 63-2 at 10, 12, 17; Doc. No. 63-5 at 3.)

[4] Plaintiffs cite the deposition testimony of Dr. Michael Levine, who noted that methamphetamine use can affect the user's judgment, in asserting that Manriquez should have known not to rely on decedent's own statements. (*See* Doc. No. 63-8 at 7.)

[5] It is unclear what symptoms, if any, decedent exhibited during the drive from the fire station to the CRF. Little evidence or discussion was presented to the court on summary judgment about the events of this period. Plaintiffs cite to the deposition testimony of Dr. Manish Amin, an emergency room doctor at Kern Medical Center, who read a chart noting that decedent became "more and more somnolent," or less arousable, during the drive. (Doc. No. 63-9 at 4–5.) However, it is unclear who wrote that chart note, what the note was based on, or what time frame is referred to in the note. Defendant Manriquez testified at his deposition that decedent seemed "more relaxed" during this portion of the drive, though he was still sweating. (Manriquez Depo. at 146.)

apnea and high blood pressure.  Typically, if the nurse believes a person entering the jail is facing an immediate medical emergency, the nurse will directly contact an ambulance for transportation to the hospital.  However, the nurse did not do so with respect to decedent.  Following the nurse's decision about the need for hospital screening, decedent was subjected to a body scan examination due to officer safety concerns.  The scan revealed no indication of contraband inside decedent's body.  Decedent was then transported to the hospital approximately twenty to thirty minutes after the nurse advised he needed to be cleared prior to booking.  During this time, both Deputy Manriquez and another officer, Sergeant Newell, spoke with decedent and repeatedly urged him to divulge if he had ingested any drugs.  Decedent continued to deny having done so.

Deputy Manriquez drove decedent from the CRF to the Kern Medical Center in his patrol car, arriving at 10:15 p.m.  Upon arriving at the Kern Medical Center, decedent was able to walk into the building on his own accord.  He was evaluated by a nurse and placed on a gurney.[6] Sometime following decedent's admission to the hospital, Manriquez was directed by his sergeant to release decedent from custody via a misdemeanor citation.

Decedent was pronounced dead at 12:13 a.m. on February 27, 2017, due to complications associated with a drug overdose.  Laboratory reports found decedent had a methamphetamine level of 8400 nanograms per milliliter in his body at the time of his death.  Dr. Robert Whitmore performed an autopsy on March 3, 2015.  Dr. Whitmore found two "foreign bodies," consistent with baggies, in decedent's stomach.  In his final autopsy report, Dr. Whitmore noted that toxicology had shown "a lethal-range methamphetamine level" in decedent's blood.

This action was initially filed in Kern County Superior Court and was removed to this federal court on February 9, 2016.  The operative complaint alleged numerous claims under both

---

[6] Deputy Manriquez testified at deposition that, while they were waiting to be seen, decedent began spitting and did not stop when told not to spit and was acting "weird."  (Manriquez Depo. by 147.)  At this point, a nurse spoke to decedent and instructed that he be moved to a gurney. (*Id.* at 148.)  According to Manriquez, by the time decedent was laying on the gurney, he was still talking but was slurring his speech and becoming difficult to understand.  (Doc. No. 63-1 at 25.) Although plaintiffs contend that there is evidence decedent was foaming at the mouth and incoherent by the time he arrived at the hospital, they have failed to provide exhibits or any other evidence on summary judgment to support that contention.

state law and 42 U.S.C. § 1983 (Doc. No. 31), but many of these and several defendants were dismissed pursuant to the stipulation of the parties on November 7, 2017.  (Doc. No. 57.)  Moreover, the court approved a settlement of the minor plaintiffs' claims on December 22, 2017, and, thereafter, defendants Hall Ambulance Service, Inc. and Brenda Robinson were dismissed from this action with prejudice.  (Doc. Nos. 70, 72, 73.)  Plaintiffs' sole remaining claims are:  (1) for wrongful death against defendants Manriquez and Kern County; (2) a § 1983 claim against defendant Manriquez under the Fourteenth Amendment for deliberate indifference to the serious medical needs of decedent; and (3) a § 1983 *Monell* claim against defendant Kern County under the Fourteenth Amendment for deliberate indifference to the serious medical needs of decedent.[7]  (*Id.* at 2.)

Defendants filed their motion for summary judgment on November 16, 2017, arguing that judgment should be granted in their favor as a matter of law on each of plaintiff's remaining causes of action.  (*See* Doc. No. 58.)  More particularly, they argue that defendant Manriquez is entitled to summary judgment either because (1) he has qualified immunity because he did not violate a "clearly established" right of the decedent; or (2) there is no triable issue of fact on the constitutional and state law claims and he is entitled to judgment in his favor as a matter of law.  Defendants also argue that various state law immunity doctrines bar the wrongful death claims.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including

---

[7]  Plaintiffs advised the court in their opposition to the current motion for summary judgment that they no longer intend to pursue a *Monell* claim against defendant Kern County.  (Doc. No. 62 at 31.)  Defendants' motion for summary judgment in their favor as to that claim will therefore be granted and the claim against the county defendant will be dismissed.

depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be

7

drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Undisputed facts are taken as true for purposes of a motion for summary judgment. *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 745 (9th Cir. 2010). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

**ANALYSIS**

**A.     Fourteenth Amendment Deliberate Indifference Claim Against Defendant Manriquez**

Defendant Manriquez moves for summary judgment in his favor on plaintiffs' deliberate indifference claim on two separate grounds: (1) that he is entitled to qualified immunity because there is "no way that a reasonable deputy could have believed that the conduct of Manriquez . . . was unlawful"; and (2) that there is insufficient evidence to demonstrate that defendant Manriquez acted with deliberate indifference in failing to transport the decedent to a hospital. (Doc. No. 58 at 23–25.) Evaluating a claim of qualified immunity involves two familiar inquiries: "(1) whether the defendant violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 945 (9th Cir. 2017). Courts have the discretion to choose the order in which to answer these questions. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, the court finds it logical to first address the question of whether there is evidence of a constitutional violation before deciding whether the right at issue is clearly established. As explained below, the court first concludes that summary judgment should not be granted in favor of defendant Deputy Manriquez on the merits of plaintiffs' claims. However, the court also concludes that Deputy Manriquez is nonetheless entitled to summary judgment in his favor on qualified immunity grounds.

/////

/////

8

*1.*     *Whether There is a Triable Issue as to Defendant's Violation of Plaintiffs'*

*Constitutional Rights*

Plaintiffs' sole § 1983 claim proceeding against defendant Manriquez is a Fourteenth

Amendment claim for deliberate indifference to serious medical needs, health, and safety.[8] (*See*

Doc. No. 31 at ¶¶ 48–55) (alleging "Violations of Plaintiffs' Rights Under the Fourteenth

Amendment to the United States Constitution"); *see also* Doc. No. 57 (dismissing plaintiff's

Fourteenth Amendment equal protection claim pursuant to stipulation).

"Inmates who sue prison officials for injuries suffered while in custody may do so under

the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not yet convicted, under

the Fourteenth Amendment's Due Process Clause." *Castro v. County of Los Angeles*, 833 F.3d

1060, 1067–68 (9th Cir. 2016) (en banc); *see also Bell v. Wolfish*, 441 U.S. 520, 535–36 (1979)

("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of

guilt in accordance with due process of law."); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir.

1998). Eighth Amendment claims for deliberate indifference to medical care proceed under a

familiar standard: a plaintiff must plead and ultimately prove that the deprivation was,

"objectively, 'sufficiently serious,'" and that the prison official had a culpable state of mind,

namely, that of "'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511

U.S. 825, 833–34 (1994). In the Eighth Amendment context, the latter requirement necessitates

subjective awareness on the part of prison officials, who must both know of and disregard "an

---

[8] Plaintiffs assert in their opposition that the constitutional claim at issue here is brought under and is governed by the Fourth Amendment, not the Fourteenth Amendment. (*See* Doc. No. 62 at 26–27) ("Plaintiffs' central § 1983 claims [sic] against Deputy Manriquez is that he unreasonably delayed and denied proper medical treatment for Mr. Levingston in violation of the Fourth Amendment's prohibition of unreasonable seizures.").) This contention is belied by plaintiffs' operative complaint. (*See* Doc. No. 31 at ¶¶ 48–55 (alleging "Violations of Plaintiffs' Rights Under the Fourteenth Amendment to the United States Constitution").) Moreover, on November 2, 2017, the parties filed a stipulation, which the court adopted by order on November 7, 2017, specifically noting that only three claims were proceeding in this matter: (1) a wrongful death claim against all defendants; (2) a Fourteenth Amendment deliberate indifference claim against defendant Manriquez; and (3) a *Monell* claim alleging deliberate indifference under the Fourteenth Amendment against Kern County. (Doc. Nos. 56, 57.) Pursuant to that stipulation, the court dismissed the remainder plaintiffs' claims. (Doc. No. 57.) In short, plaintiffs have not alleged a Fourth Amendment claim here.

excessive risk to inmate health or safety." *Id.* at 837; *see also Mendiola-Martinez v. Arpaio*, 836

F.3d 1239, 1248–49 (9th Cir. 2016); *Harrington v. Scribner*, 785 F.3d 1299, 1304 (9th Cir. 2015)

("Constructive notice does not suffice to prove the requisite knowledge.").

      The Ninth Circuit has clarified that, in the context of pretrial detainees protected by the

Fourteenth Amendment, deliberate indifference is interpreted solely from an objective

perspective, and has no subjective component. *Castro*, 833 F.3d at 1069–70. Rather, "a pretrial

detainee who asserts a due process claim for failure to protect [must] prove more than negligence

but less than subjective intent—something akin to reckless disregard." *Id.* at 1070–71. Thus,

plaintiffs here must plead and prove four elements to prevail on their deliberate indifference

claim:  (1) "[t]he defendant made an intentional decision with respect to the conditions under

which the [decedent] was confined"; (2) "[t]hose conditions put the [decedent] at substantial risk

of suffering serious harm"; (3) "[t]he defendant did not take reasonable available measures to

abate that risk, even though a reasonable officer in the circumstances would have appreciated the

high degree of risk involved—making the consequences of the defendant's conduct obvious"; and

(4) "[b]y not taking such measures, the defendant caused the [decedent's] injuries." *Id.* at 1071.

      Additionally, numerous federal courts have found deliberate indifference claims

cognizable when law enforcement officers and/or prison officials[9] have failed to adequately

respond to known or suspected drug overdoses. *See Border v. Trumbull Cty. Bd. of Comm'rs*,

414 Fed. App'x 831, 837–39 (6th Cir. 2011) (denying qualified immunity where officer believed

decedent was under the influence of narcotics and decedent was severely intoxicated and

obviously disoriented); *Prado v. Lane*, 98 Fed. App'x 757, 758–60 (10th Cir. 2004) (denying

qualified immunity where officer was told decedent may have overdosed on medicine, was

semiconscious, and fell to the ground when trying to enter police car); *Estate of Lawson ex rel.

Fink v. City of Hamilton*, No. C-1-07-927, 2009 WL 1444556, at *17 (S.D. Ohio May 21, 2009)

---

[9]  While many of these cases involve claims brought by prisoners under the Eighth Amendment, such cases set a constitutional floor for the treatment of pretrial detainees as well. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (noting pretrial detainees' constitutional rights "are at least as great as the Eighth Amendment protections available to a convicted prisoner"); *Bustamante v. Superior Court*, No. C 11-3492 SBA (PR), 2012 WL 2150242, at *2 (N.D. Cal. June 12, 2012).

(denying qualified immunity where officer was aware decedent was under the influence of some unknown drug, decedent fell asleep in a "contorted and bizarre position," and did not change her position for a substantial period of time); *Hall v. County of Nemaha*, 509 F. Supp. 2d 821, 832 (D. Neb. 2007) (denying summary judgment to defendants who were told decedent was overdosing, who saw him "panting and gasping," and who heard him say he needed to go to the hospital); *Pryor v. Dearborn Police Dep't*, 452 F. Supp. 2d 714, 719–21 (E.D. Mich. 2006) (denying summary judgment where officers were aware of symptoms of a drug overdose and yet failed to summon medical assistance); *Hutto v. Davis*, 972 F. Supp. 1372, 1376–78 (W.D. Okla. 1997) (denying summary judgment for officers who "did nothing while [decedent] lay convulsing on the floor of his jail cell while other inmates repeatedly called for help," but granting summary judgment in favor of the booking officers).

It appears that there is considerable authority supporting the notion that law enforcement officers are not deliberately indifferent to an arrestee's or detainee's serious medical needs where the officer's reliance on the advice of medical personnel is reasonable under the circumstances at hand. *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1084 (9th Cir. 2013) ("[Defendants] did not act with deliberate indifference toward [plaintiff] as they *reasonably* relied on the expertise of the prison's medical staff.") (emphasis added); *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (indicating that there was no liability for a prison official where the need for medical intervention was "not obvious" and the defendant "*reasonably* deferred to the medical professionals' opinion") (emphasis added); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("[W]e conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."); *Dau v. County of Imperial*, No. 12cv0432 DMS (PCL), 2013 WL 2295463, at *8 (S.D. Cal. May 24, 2013) (finding a disputed question of fact precluding summary judgment as to whether a watch commander could be held liable for failing to summon an ambulance, despite the presence of a nurse to whose opinion the watch commander had deferred). Although the parties have not cited, and the court has not found, authority specifically stating as such, one could infer

from these cases that a cognizable claim of deliberate indifference could be sustained against a law enforcement officer where the facts indicate an arrestee's or detainee's need for medical assistance was so obvious as to render it unreasonable for the officer to rely on a medical provider's opinion to the contrary. Thus, arguably, one in defendant Manriquez's position could be found liable for failing to respond appropriately to a suspected drug overdose, even in the face of contrary medical advice, where relying on that medical advice is objectively unreasonable.

Defendant Manriquez asserts that, "[t]o defeat summary adjudication on this claim, Plaintiffs must present evidence that shows that Manriquez actually knew that Decedent swallowed/ingested drugs, needed immediate medical attention and did nothing about it, or was reckless in his disregard of the obvious signs." (Doc. No. 58 at 28–29.) The court disagrees. Plaintiffs *need not* prove Deputy Manriquez actually knew decedent had swallowed or ingested excessive amounts of drugs to prevail on their deliberate indifference claim. This is the holding of *Castro*: subjective knowledge of an excessive risk need not be shown by pretrial detainees proceeding with deliberate indifference claims. 833 F.3d at 1070–71 ("[A] pretrial detainee need not prove those subjective elements about the officer's actual awareness of the level of risk."). Rather, in support of such a claim plaintiffs must show that the defendant failed to take reasonable available measures to ameliorate the risk "even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved." *Id.* at 1071. As such, the question here is whether, based upon the evidence presented on summary judgment, a rational jury could find that a reasonable officer would have appreciated the high degree of risk to the decedent, and yet the defendant officer still failed to take reasonable available measures to prevent that harm.

The court concludes on the basis of the undisputed facts here that a jury could find not only that a reasonable officer would have appreciated the degree of risk to the decedent, but also that defendant Manriquez actually did appreciate that risk. The undisputed facts on summary judgment demonstrate that Deputy Manriquez knew or suspected decedent was under the influence of methamphetamine when he was arrested, a suspicion generally confirmed by decedent's actions following his arrest. (Doc. No. 62-1 at ¶¶ 13–16.) Manriquez also observed

decedent acting erratically in the back of the patrol car on two separate occasions, in a manner that suggested he was attempting to hide either a weapon or drugs, likely the latter and likely by swallowing them. (*Id.* at ¶¶ 20, 26–28.) The behavior was erratic enough that the deputy found it necessary to pull the patrol car over twice while en route to the jail for booking. (*Id.* at ¶¶ 21–27.) Manriquez asked decedent whether he had ingested narcotics many times throughout the encounter, further indicating his strong suspicion that decedent had done exactly that. (*Id.* at ¶¶ 23, 29, 44, 49, 56, 57.) Additionally, defendant Manriquez had decedent evaluated by two sets of individuals—the firefighters and a paramedic—with at least some medical training. (*Id.* at ¶¶ 31, 32, 36–40.) The parties dispute exactly what paramedic Robinson told Deputy Manriquez (*see id.* at ¶¶ 36–40), but the mere fact that Manriquez was concerned enough about decedent to summon this medical assistance supports an inference that he, in fact, believed that decedent likely had ingested drugs.

   In order to have violated decedent's Fourteenth Amendment rights, Manriquez must also not have taken "reasonable available measures to abate" the risk that decedent was overdosing on methamphetamines. *Castro*, 833 F.3d at 1071. The undisputed facts on summary judgment establish that Manriquez appreciated the potential dangers facing decedent from ingesting narcotics, as Manriquez repeatedly warned decedent that he could die if that was what he had done. (Doc. No. 62-1 at ¶ 43.) Once Manriquez had formed a suspicion that the decedent had ingested methamphetamines and could die as a result, he had decedent evaluated by both firefighters and a paramedic. It is undisputed that the paramedic and firefighters represented to Manriquez that decedent was okay. Accordingly, in order for plaintiffs to demonstrate a Fourteenth Amendment violation, decedent's symptoms must have been sufficiently pronounced that it would have been apparent to a layperson that he was overdosing and that Deputy Manriquez therefore should have sought additional medical help regardless of what the firefighters and paramedic advised.

   There is some evidence on summary judgment supporting such a conclusion. Manriquez testified at deposition that, in all their prior interactions, decedent had been respectful and never swore. (Manriquez Depo. at 117.) On this occasion, however, decedent was swearing routinely,

sweating profusely, and acting in an agitated and upset manner. (*Id.*) Manriquez also testified that he had "never encountered someone acting the way [decedent] was," that night despite having interacted with people intoxicated on methamphetamines at other times who were "all over the place," "can't stop moving" and were "very fidgety." (*Id.* at 25, 118.) Additionally, between the time of his arrest and the time the officer stopped at the fire station to have decedent checked, Manriquez noticed an obvious change in decedent's behavior, noting that he "wasn't the same individual that I initially contacted during the traffic stop." (*Id.* at 197.) A jury could reasonably infer from this testimony that the obvious change in the decedent's behavior indicated that his condition was rapidly declining, as one might expect in the case of an overdose. Finally, other deputies present at the fire station also observed signs that decedent was under the influence of methamphetamine, noting that he was sweating, had a white coating in his mouth, was paranoid, had an inability to hold still, and was speaking rapidly. (Doc. No. 63-2 at 10, 12, 17; Doc. No. 63-5 at 3.) Plaintiffs have also come forward on summary judgment with additional evidence reinforcing this view. Dr. Ron Martinelli[10] testified at his deposition that, if Deputy Manriquez believed decedent had ingested drugs, "then he needs to follow that belief, and he needs to take Mr. Levingston immediately to a hospital." (Doc. No. 62-1 at 28; Doc. No. 63-11 at 24.)[11] Another expert, Dr. Marvin Pietruszka, testified that any individual who is under the influence of methamphetamines and has an elevated heart rate should be taken to a hospital.

---

[10] Dr. Martinelli holds a Ph.D. in criminology and is not a medical doctor, though he has received training as a medical investigator. (Doc. No. 63-11 at 51.)

[11] Dr. Martinelli has apparently been proffered as an expert of police practices and procedures. (Doc. No. 63-11 at 12–13, 49.) While defendants object to this testimony as impermissible legal or medical opinion (Doc. No. 65 at 32), the testimony is at least relevant to the extent it could inform a factfinder of whether officers are typically instructed that an arrestee must be transported to a hospital under these circumstances. Such information would be relevant to a jury's determination of the reasonableness of an officer's conduct. *See Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) ("Although such training materials are not dispositive, we may certainly consider a police department's own guidelines when evaluating whether a particular use of force is constitutionally unreasonable."); *Dean v. City of Fresno*, 546 F. Supp. 2d 798, 805 (E.D. Cal. 2008) (observing that police offers were "trained that if they have a reasonable belief that a suspect has swallowed a controlled substance . . . they should render medical aid, contact emergency medical services or transport the suspect to the hospital").

(Doc. No. 63-12 at 21.) Dr. Pietruszka also testified that decedent should have been taken to a hospital immediately because he exhibited symptoms of methamphetamine use and because doing so would have "avoided a prolonged transport," during which the decedent "could consume additional methamphetamine." (Doc. No. 63-12 at 10.)

On summary judgment, the court is to draw "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls*, 653 F.3d at 966. Doing so here, the court concludes that whether Deputy Manriquez took "reasonable available measures" to abate the risk that decedent was overdosing is not a question suitable for resolution on summary judgment. The reasonableness of a person's actions is a quintessentially factual inquiry typically undertaken by a factfinder upon the consideration of all the evidence. *See Sloman v. Tadlock*, 21 F.3d 1462, 1468 (9th Cir. 1994) ("[E]valuating the reasonableness of human conduct is undeniably within the core area of jury competence."); *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991) (holding that the reasonableness of the force used "is usually a question of fact to be determined by the jury"); *Boehm v. Am. Broad. Co., Inc.*, 929 F.2d 482, 488 (9th Cir. 1991) (observing that the "question as to the reasonableness of [plaintiff's] efforts to obtain other employment and fulfill his obligation of mitigating damages . . . is one of fact"); *see also Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010) ("Whether the use of deadly force is reasonable is highly fact-specific."). Only where the evidence is susceptible of only one interpretation can the question of reasonableness be decided as a matter of law. *See Evanston Ins. Co. v. OEA, Inc.*, 566 F.3d 915, 920 (9th Cir. 2009) (noting that reasonableness becomes a question of law where "the facts leave no room for a reasonable difference of opinion"); *West v. State Farm Fire & Cas. Co.*, 868 F.2d 348, 351 (9th Cir. 1989) (same); *see also Wilkinson*, 610 F.3d at 551.

That is not the case here in light of the evidence before the court on summary judgment. Rather, the court concludes that a reasonable jury could find from the evidence that, given Manriquez's concerns that decedent had ingested methamphetamine and his personal observations of the decedent's symptoms, the only appropriate course of action was to transport him to a hospital. While the parties dispute whether the closest hospital—apparently located in Tehachapi—was sufficiently equipped to handle this type of emergency, this is a dispute of little

15

relevance to resolution of the pending motion. It is undisputed that Manriquez did not take decedent directly to the hospital upon his arrival in Bakersfield, but first took him to the jail and only later took him to Kern Medical Center after being directed to do so by jail staff. The fact that Deputy Manriquez had decedent evaluated by a paramedic and that the paramedic did not recommend the decedent be taken to a hospital is important evidence that might weigh heavily in a jury's reasonableness determination, but does not foreclose a finding of liability as a matter of law in this case.

For these reasons, the court concludes defendant Manriquez has failed to demonstrate he is entitled to summary judgment on the merits of plaintiffs' deliberate indifference claim.

### 2. Whether the Right at Issue is Clearly Established

Having concluded that there is a cognizable constitutional claim for a jury to consider here, the court now turns to the question of whether the constitutional right placed at issue by plaintiffs' claim was clearly established at the time of the defendant's conduct. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. ___, 136 S. Ct. 305, 308 (2015) (internal quotations omitted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) and *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Bruce v. Ylst*, 351 F.3d 1283, 1290 (9th Cir. 2003); *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Hughes v. Kisela*, 862 F.3d 775, 782 (9th Cir. 2016).

In this regard, while a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 741); *see also Hughes*, 862 F.3d at 783; *A. K. H. by and through Landeros v. City of Tustin*, 837 F.3d 1005, 1013 (9th Cir. 2016); *Clement v. Gomez*, 298 F.3d

16

898, 906 (9th Cir. 2002) ("The proper inquiry focuses on . . . whether the state of the law [at the relevant time] gave 'fair warning' to the officials that their conduct was unconstitutional.") (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 136 S. Ct. at 308 (emphasis in original) (quoting *al-Kidd*, 563 U.S. at 742). This inquiry must be undertaken in light of the specific context of the particular case, rather than as a broad general proposition. *Id.*; *Saucier*, 533 U.S. at 201.

Plaintiff bears the burden of demonstrating the existence of a "clearly established" right at the time of the allegedly unconstitutional conduct. *Maraziti v. First Interstate Bank*, 953 F.2d 520, 523 (9th Cir. 1992); *see also Tarabochia v. Adkins*, 766 F.3d 1115, 1125 (9th Cir. 2014); *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). "[R]egardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991); *see also District of Columbia v. Wesby*, ___ U.S. ___, ___, 138 S. Ct. 577, 590 (2018) ("The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."). The inquiry begins "by looking to binding precedent[;] [i]f the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end." *Tarabochia*, 766 F.3d at 1125 (quoting *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004)). Absent binding authority, the court may look to other decisional law, including decisions of state courts, other circuits, and district courts. *Id.* The ultimate question is whether the rule to be applied is "settled law," meaning "it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Wesby*, 138 S. Ct. at 589–90 (internal quotations omitted). "[I]t is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness was apparent in light of existing law." *Tekle v. United States*, 511 F.3d 839, 847 (9th Cir. 2007) (quoting *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003)).

/////

It is beyond question that the right of both pretrial detainees and convicted prisoners to receive sufficient medical care to address their serious medical needs is clearly established.  *See Farmer*, 511 U.S. at 847; *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). However, the inquiry does not end there, as the court must be careful not to define the right too broadly or at too "high [a] level of generality."  *Plumhoff v. Rickard*, ___ U.S. ___, ___, 134 S. Ct. 2012, 2023 (2014) (quoting *al-Kidd*, 563 U.S. at 742); *see also Wesby*, 138 S. Ct. at 590.  This requires a "high 'degree of specificity,'" *Wesby*, 138 S. Ct. at 590 (quoting *Mullenix v. Luna*, 577 U.S. ___, ___, 136 S.Ct. 3305, 309 (2015)), though again, not "a case directly on point," *al-Kidd*, 563 U.S. at 741.

Here, a fair analysis of the relevant question before the court is this:  whether it was clearly established in February 2015 that an officer suspecting an arrestee had ingested methamphetamine is deliberately indifferent when that officer fails to transport the arrestee to a hospital, despite having the arrestee seen by a paramedic, if the arrestee's symptoms could arguably make it obvious he is overdosing.  Plaintiffs have not pointed to any cases showing that it was clearly established at the time of this unfortunate event that the constitutional right to free from deliberate indifference to a serious medical need would be violated under these circumstances.  After its own review, the court concludes such a right was not clearly established. As noted above, there are decisions suggesting that, under certain circumstances, an officer may not escape liability for failing to intervene despite the presence of medical personnel, when the need for intervention is clearly obvious.  *See Lemire*, 726 F.3d at 1084 (suggesting that prison staff are not deliberately indifferent so long as they reasonably rely on the advice of medical personnel); *Johnson*, 433 F.3d at 1010 (same); *Spruill*, 372 F.3d at 236 (same); *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992) (concluding prison officials may act with deliberate indifference when they "choos[e] to rely upon a medical opinion which a reasonable person would likely determine to be inferior") *overruled on other grounds in Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1045 (9th Cir. 2002);  *see also Austin v. County of Alameda*, No. C-15-0942 EMC, 2015 WL 3833239, at *7 (N.D. Cal. June 19, 2015) (noting that a prison official

bringing a prisoner to the on-call nurse did not preclude a deliberate indifference claim if the nurse provided facially inadequate care). However, there have also been numerous decisions rendered in situations where the officers lack certainty about a potential medical emergency facing a person in their custody, that those officers are entitled to rely on the advice they receive from medical professionals. *See Spears v. Ruth*, 589 F.3d 249, 255–56 (6th Cir. 2009) (granting qualified immunity and noting officer "was entitled to rely on the EMTs' and the jail nurse's medical assessments that [plaintiff] did not need to be transported to the hospital"); *see also Border*, 414 Fed. App'x at 839; *Millard v. Oregon Dep't of Corr.*, No. 2:12-cv-01244-SI, 2014 WL 2506470, at *7–8 (D. Ore. June 3, 2014) ("[Defendant] was entitled to rely on the medical opinions of the Health Services staff so long as a reasonable person would not have determined that the treatment of [plaintiff] was unreasonable."); *Lambert v. Soto*, No. 10cv1976-AJB(BLM), 2012 WL 5878503, at *9 (S.D. Cal. Sept. 21, 2012) *report and recommendation adopted* 2012 WL 5878427; *Barber v. Santa Barbara County*, No. CV 11-2365-DMG (MLG) 2011 WL 6951838, at *6 (C.D. Cal. Nov. 14, 2011) *report and recommendation adopted* 2012 WL 27782; *cf. Estate of Prasad ex rel. Prasad v. County of Sutter*, 958 F. Supp. 2d 1101, 1112–13 (E.D. Cal. 2013) (noting that prison staff may be found deliberately indifferent when they unreasonably rely on their own "non-specialized conclusions" that run counter to those of a medical professional) (quoting *Snow v. McDaniel*, 681 F.3d 978, 986 (9th Cir. 2012)).

The crux of this case is both straightforward and undisputed: Deputy Manriquez, apparently concerned, though uncertain, that his arrestee had ingested drugs, sought medical attention for the decedent from firemen and then a paramedic. When neither the firemen nor the paramedic recommended further medical intervention, defendant Manriquez did not seek it. Even construing the evidence in favor of plaintiffs, the circumstances were not such that any reasonable official would have understood they were violating decedent's constitutional rights by failing to transport him immediately to a hospital. *See Wesby*, 138 S. Ct. at 590; *al-Kidd*, 563 U.S. at 741; *Hughes*, 862 F.3d at 782 ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.") (quoting *al-Kidd*, 563 U.S. at 743); *Davis v. City of Las Vegas*, 478 F.3d 1048, 1056 (9th Cir. 2007) ("The 'dispositive

19

inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'") (quoting *Saucier*, 533 U.S. at 202); *Boyd*, 374 F.3d at 780–81.  Defendant Manriquez is therefore entitled to summary judgment in his favor on qualified immunity grounds.

### B.      Wrongful Death

This case was originally removed from Kern County Superior Court on the basis of federal question jurisdiction.  (*See* Doc. No. 1 at ¶ 4.)  Because the court has concluded defendant Manriquez is entitled to qualified immunity and plaintiffs have advised the court they do not wish to pursue their § 1983 claim against defendant Kern County, there are no longer any federal causes of action remaining in this action.

Once all federal claims have been dismissed from a case, whether to retain jurisdiction over any remaining state law claims is left to the discretion of the district court.  *See* 28 U.S.C. § 1367(c)(3); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 537 (9th Cir. 1989).  Generally, if federal claims are dismissed prior to trial, state law claims should be remanded to state court "both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Acri*, 114 F.3d at 1000.  If the court declines to exercise supplemental jurisdiction over the state-law claims, the court should remand those claims to state court.  *Simmons v. Navajo County*, 609 F.3d 1011, 1023 (9th Cir. 2010).

The parties contest various aspects of plaintiffs' state law wrongful death claim, all of which are fundamentally questions of California law, including whether defendant Manriquez breached a duty of care, whether he was the proximate cause of decedent's death, and whether three different immunity provisions found in California statutes and relied upon by defendants are applicable under the facts of this case.  Moreover, at oral argument on the pending motion neither party voiced opposition to this case being remanded to Kern County Superior Court if no federal

issues remained in the case following this court's order on summary judgment. The court will therefore decline to exercise supplemental jurisdiction over plaintiffs' remaining state law claims. To the extent defendants seek summary judgment in their favor on plaintiffs' state-law wrongful death claims, their motion will be denied without prejudice and the matter will be remanded to the Kern County Superior Court.

## CONCLUSION

For all of the reasons set forth above:

1. Defendants' motion for summary judgment (Doc. No. 58) is granted on plaintiff's Fourteenth Amendment claim against defendant Manriquez, solely on qualified immunity grounds;

2. Defendants' motion for summary judgment as to plaintiffs' state law claims is denied without prejudice to the refiling of that motion in state court;

3. Plaintiffs' having withdrawn their *Monell* claim brought pursuant to 42 U.S.C. § 1983 against Kern County (*see* Doc. No. 62 at 31), that claim is dismissed;

4. The court declines to exercise its supplemental jurisdiction over plaintiffs' remaining state law claims and this case is remanded back to the Kern County Superior Court with respect to those remaining claims; and

5. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:  __March 14, 2018__        _____
                                  UNITED STATES DISTRICT JUDGE